IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

LAURA ADAMS,

      Plaintiff,

v.                                CASE NO. 1:16-cv-309-WTH-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff appeals to this Court from a final decision of the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits pursuant to Title II and Title XVI, respectively, of the Social Security Act ("the Act"). (ECF No. 1.) The Commissioner has answered, (ECF No. 8), and both parties have filed briefs outlining their respective positions. (ECF Nos. 17–18.) For the reasons discussed below, the Commissioner's decision is due to be affirmed.

# I. PROCEDURAL HISTORY

Plaintiff previously filed an application for Title II DIB and Title XVI benefits, alleging disability beginning October 2, 2008. (R. 98.) That application resulted in a hearing level decision on March 1, 2012, finding that Plaintiff was not under a disability from October 2, 2008, through March 1, 2012. (R. 98–108.) Plaintiff then filed the instant application for Title II DIB and Title XVI SSI benefits on March 15, 2012, alleging disability beginning October 10, 2008.

Plaintiff claims she cannot work for a variety of reasons: generalized anxiety disorder, depression, dysthymia, panic attacks, migraines, joint pain, right side hip pain, back pain, muscle spasms, shoulder pain, bilateral knee pain, foot pain, irritable bowel syndrome, gastroesophageal reflux disease, burping, and asthma. (R. 356.) Plaintiff's claim was denied initially and upon reconsideration. Plaintiff attended an administrative hearing before Administrative Law Judge ("ALJ") Kelley Fitzgerald on August 20, 2014.  (R. 58–88.) The ALJ issued a written decision on September 4, 2014, finding the Plaintiff not disabled.  (R. 38–51.) On July 19, 2016, the Appeals Council denied Plaintiff's request for review. (R. 1–6.) Plaintiff subsequently appealed the ALJ's decision to this Court.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. §§ 404.1505, 416.905 (2016).[1] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511, 416.905–416.911.

The ALJ must follow five steps in evaluating a claim of disability. 20

---

[1] All further references to 20 C.F.R. will be to the 2016 version, unless otherwise specified.

C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, she is not disabled. §§ 404.1520(b), 416.920(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. §§ 404.1520(c), 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. §§ 404.1520(d), 416.920(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. §§ 404.1520(e)–(f), 416.920(e)–(f). Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. §§ 404.1520(g), 416.920(g).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278

(11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2]

## III.  SUMMARY OF THE RECORD

### A.    Medical Records

Plaintiff reported to Murray Hill Family Practice ("Murray Hill") on March 28, 2012 for gastric complaints. (R. 499.) She was oriented to time, person, and place, demonstrated normal speech and content, had appropriate mood and affect, and was interactive and responsive. (R. 501.) When Plaintiff returned on April 19, 2012 for her test results, she was counseled on breathing and medication techniques for her anxiety. (R. 491.)

Plaintiff began treating with the University of Florida Department of

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Psychiatry ("UF Psychiatry") on April 4, 2012. (R. 520.) Plaintiff reported

suffering from generalized anxiety, panic attacks, and depressive

symptoms due to dysthymia. She was taking five milligrams of Abilify and

20 milligrams of Paroxetine once per day for depression, and one milligram

of Clonazepam twice per day for anxiety. (R. 520.) Her response to

medication and other concurrent treatment was good. Upon examination,

Plaintiff was assessed with generalized anxiety disorder, panic disorder

with agoraphobia, and dysthymic disorder. Her Global Assessment of

Functioning ("GAF") score was 65. (*Id.*)[3] On the Functional Assessment

Rating Scale ("FARS"), her depression was estimated to be a 3 (slight

problem), her anxiety a 6 (moderate to severe), and her hyper affect a 1

(no problem), for a total FARS score of 10. (R. 521.) Plaintiff was to

undergo individual therapy once a week for four months with a goal to

achieve a 50% improvement in her FARS score. (R. 520–21.)

Plaintiff returned for a follow-up psychotherapy session at UF

Psychiatry on April 12, 2012. (R. 518.) She reported restful sleep quality, a

normal energy level, good response to treatment, and did not complain of

---

[3] GAF scores are routinely used by "mental health physicians and doctors . . . to rate the occupational, psychological, and social functioning of adults." *McCloud v. Barnhart*, 166 F. App'x 410, 413 n.2 (11th Cir. 2006) (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (Text Revision, 4th ed. 2000)).

insomnia. Plaintiff was cooperative, engaged, and maintained eye contact. Her motor activity was purposeful and her speech normal, despite some mumbling. Plaintiff's affect was normal and her thought process clear. Although her mood was mildly anxious and her thoughts were negative, her thought content did not contain delusions. During therapy Plaintiff practiced deep breathing exercises to relieve her anxiety. She also discussed her relationship with her mother. Mental imagery was used to explore the ways the relationship may change. (*Id.*) Plaintiff's recovery prognosis was good. (R. 519.)

At her next psychotherapy session on April 23, 2012, Plaintiff reported sleep issues as her chief complaint. (R. 516.) She also said she was experiencing rage about once a month and had low energy. Her response to treatment, however, was good. During the session, Plaintiff was cooperative, engaged, and maintained eye contact. Her motor activity was coordinated. Although her speech was moderately low in volume and she would trail off during a thought, her affect was normal and her thought process clear. Despite a lightly anxious mood, her thought content did not contain delusions, her thoughts were neutral, and her mental attitude was mostly positive. (*Id.*) Cognitive behavioral therapy was used to reduce the

physical reaction to Plaintiff's rage feelings by telling herself calming

statements. (R. 517.) Plaintiff also demonstrated the ability to use a

cognitive strategy to lessen her irrational worries. (*Id.*)

At her therapy session on May 9, 2012, Plaintiff's chief complaints

were anxiety and pain. (R. 514.) Nonetheless, she had not had any panic

attacks since her last session. She did, however, report some depressive

feelings due to her back pain. Although her sleep quality was still poor, it

was nonetheless slowly getting better because her sleep schedule was

starting to take form. She did not complain of insomnia and she had no

medication complaints. Plaintiff described her activities of daily living as

independent and that her response to treatment was good. During the

session Plaintiff was cooperative, engaged, and maintained eye contact.

Her motor activity was coordinated and her speech normal but low in

volume. Although her affect was blunted and her mood slightly anxious, her

thought process was clear and organized, without delusions, and positive.

Plaintiff's mental attitude was also positive. (*Id.*) Plaintiff stated that she

had been good recently and discussed possible volunteering and a new

sleep schedule. (R. 515.)

Plaintiff's next psychotherapy session occurred on May 16, 2012. (R.

512.) Her chief complaint was concerns with physical issues. Plaintiff reported that her mental symptom severity was improved, her sleep quality was restful, and her energy level was normal. Plaintiff was cooperative, open, and engaged during the session. Her speech was normal in rhythm and rate although low in volume. Plaintiff's affect was bright and her thought process was organized. Despite an anxious mood, her thought content did not contain delusions and her mental attitude was positive. (*Id.*) Plaintiff worked on developing healthy cognitive patterns based on her past success and how she can continue to succeed in her life despite her hardships. (R. 513.)

Plaintiff returned to UF Psychiatry for a medication management appointment with Leslie Rosenberg, ARNP, on May 17, 2012. (R. 510.) Plaintiff reported having little interest or pleasure in doing things and that she feels down, depressed, and hopeless. She also stated that she has trouble falling asleep and that she feels tired and has little energy. She also has trouble concentrating and focusing. (*Id.*) Plaintiff's affect was apprehensive and her mood anxious and depressed. (R. 511.) Her cognition was intact, however, and her insight and judgment fair. Plaintiff's medication plan was altered to decrease and eventually discontinue Paroxetine, restart Effexor, continue Abilify for depression, and change the

Clonazepam dosage for anxiety. (*Id.*)

At her May 24, 2012, psychotherapy session, Plaintiff's chief complaint was disturbing dreams involving running away from a person obsessed with her. (R. 508.) She did not complaint of insomnia, however, and her energy level was normal. She reported having a good response to treatment and had no medication complaints. During the session Plaintiff was cooperative, engaged, and maintained eye contact. Although her affect was blunted, her mood was euthymic, she spoke at a normal rate and rhythm, and she had a clear thought process. She did not have any delusions, her thoughts were positive and future oriented, and her mental attitude was mostly positive. (*Id.*) Therapy included work on coping with anxiety through relaxation and a discussion about the difference between perceived level of threat and actual level of threat in Plaintiff's dream as it related to her anxieties. (R. 508–09.) Plaintiff also set a goal to go on a walk three times a week and clean at least 1/4 of her room. (*Id.*)

At her next psychotherapy follow-up on May 31, 2012, Plaintiff's chief complaint was not feeling productive. (R. 506.) She stated that she was scared that she would never work again but nonetheless reported having mild mental symptoms, restful sleep, normal energy levels, no medication

complaints, and good response to treatment. Plaintiff was cooperative and open during the session. She was engaged, maintained eye contact, and had coordinated motor activity. Plaintiff's speech was normal and her affect labile. Her mood, however, was mildly depressed and her thought process clear but mildly tangential. Plaintiff's thoughts were negative and not future oriented. (*Id.*) During the session, supportive therapy was used to help Plaintiff recognize her accomplishments. (R. 507.) Her negative thoughts were challenged and she was encouraged to use positive self talk to improve self esteem. Plaintiff verbalized a connection between her depression and feelings of hopelessness. Nonetheless, her recovery prognosis remained good. (*Id.*)

Plaintiff was referred to Robin M. Johnson, Psy.D., for a general clinical evaluation with mental status on July 6, 2012. (R. 525–28.) Plaintiff arrived to the appointment unaccompanied, having driven herself approximately thirteen miles to reach the office. Plaintiff reported completing the eleventh grade and eventually receiving her GED in 1997. Plaintiff described her mood as "morose" and verbalized lack of enjoyment and never feeling happy. She said she has panic attacks every couple of weeks, triggered by crowds and fear of obligations. Plaintiff reported

suicidal ideations, but denied intent or plan. She acknowledged that she is very self-critical and overly sensitive. Her affect was anxious and intermittently tearful. (*Id.*)

Plaintiff reported spending her days reading, watching television, spending time on the computer, or running errands for her parents. Her father, however, does most of the grocery shopping because she has panic attacks when she goes into the grocery store. She attends to her hygiene without much difficulty and needs no reminders to take her medications. She sleeps about five hours per night and naps during the day. Her pain medication makes her drowsy. She prepares quick meals, mostly using the microwave. Her appetite is poor, however, due to excessive burping and vomiting. Although her chores are limited due to back pain, she does her laundry and loads the dishwasher. Although she has limited socialization, Plaintiff denied difficulty in getting along with the general public or with authority figures, provided they are not rude to her. She reported a past history of cocaine abuse, from 2002 to 2010, but that she has never received substance abuse treatment. (*Id.*)

Plaintiff could relate information in a rational, coherent, and sequential fashion, without evidence of tangential or circumstantial

thinking. There were no obvious impairments in her concentration,

attention, or memory. Plaintiff was oriented on all spheres. There were no

observable indications of perceptual disturbances or of a psychotic nature.

During the session Plaintiff was cooperative and receptive. She

demonstrated normal speech and exhibited no excessive or unusual

psychomotor behaviors other than several quiet burps during the

evaluation. Plaintiff's cognitive functioning appeared to be in the average to

high average range. Although her insight appeared poor, her judgment was

intact. (*Id.*)

Dr. Johnson assessed Plaintiff with: (1) Generalized anxiety disorder,

by history; (2) Panic disorder with agoraphobia; (3) dysthymic disorder; and

(4) Cocaine abuse, in sustained full remission. Plaintiff was assessed a

GAF score of 60. Dr. Johnson estimated Plaintiff's prognosis to be fair with

continued psychiatric services. (*Id.*)

Plaintiff reported to Murray Hill on September 20, 2012 for belching,

back pain, and foot pain. (R. 551.) Upon examination Plaintiff was

interactive, responsive, and oriented to time, person, and place. She

demonstrated normal speech and content and appropriate mood and

affect. (R. 550.)

In September 2013, Plaintiff reported to the Total Care Clinic at

Shands Jacksonville ("Total Care Clinic") for medication refills and a follow up regarding her anxiety, pain and test results. (R. 658.) Plaintiff reported having anxiety and being depressed. (R. 663.) Examination revealed normal mood, affect, speech, and memory. (R. 664.) Plaintiff was assessed with, among other things, anxiety, insomnia, and depression. (R. 667.)

At another follow up at the Total Care Clinic in October 2013, Plaintiff denied having anxiety, depression, or suicidal ideations. (R. 652.) She also stated that she does not have trouble sleeping. (R. 651.) Upon examination, her speech and affect were normal and there was no evidence of depression or anxiety. (R. 652.)

Plaintiff next returned to the Total Care Clinic on April 3, 2014, for a mental health initial assessment. (R. 704.) Plaintiff's chief complaints were depression, manifesting as fatigue and impaired concentration, binge eating, and use of cannabis. She stated that her sleep quality was restful but her energy low, her affect intense, and her mood anxious. She reported having an organized thought process without delusions and no signs of mania. Her current stressors were health and financial problems. Her strengths included her coping ability. She relieves stress by reading classic

literature and horse related activities. Plaintiff reported being raped and beaten at a slumber party when she was twelve years old. (*Id.*)

Upon mental status examination Plaintiff was cooperative and demonstrated average speech rate and rhythm. She was alert and oriented and demonstrated a logical and coherent thought process. Although her mood was depressed, her affect was congruent. There was no risk of suicide or violence. Plaintiff's psychomotor activity was normal. She was able to spell the word "world" forward and backwards as well as name the current president and the prior president. Thus, her recent and remote memory appeared to be grossly intact. Plaintiff was able to comprehend the current situation correctly and demonstrated the ability to orient her behavior appropriately. Her insight and judgment were intact. She also understood and appreciated the impact of her psychiatric condition and the need for treatment. Plaintiff also appeared to have the capacity to comply with treatment recommendations. (*Id.*)

Plaintiff was assessed with: (1) Generalized anxiety disorder; (2) Panic disorder with agoraphobia; and (3) dysthymic disorder. (R. 705.) Her GAF score was a 51–60. Plaintiff was instructed to continue taking Effexor and Abilify. She also completed a coping skills series and was provided

with educational materials for managing anxiety and depression. She was

further instructed to avoid controlled substances due to violating her

narcotic contract after testing positive for marijuana. (*Id.*)

## B.   Hearing Testimony

Plaintiff is not married and lives with her parents. (R. 66.) She

completed some college but did not get a degree or certification. (R. 61.)

Plaintiff is on Facebook and uses email. (R. 70.) She has a driver's license

and drives three times a week, mostly to the grocery store. (R. 62.) Other

than the store she goes to her friend Debbie's house to watch a movie

approximately twice a month. (R. 69–70.)

During a typical day Plaintiff wakes up sometime between 9:00 a.m.

and 1:00 p.m., takes her morning medication, and then watches television

or tries to read. (R. 67.) She has trouble reading, however, because she

cannot concentrate. Then Plaintiff takes her noon medication, piddles

around, and sometimes cleans the house a little provided her back is not

too bad. (*Id.*) She is unable to do any chores that involve reaching up

above her shoulder, such as cleaning windows or polishing the kitchen

cabinets. (R. 68.) Afterwards Plaintiff takes her evening medication,

watches an hour of television, usually Law and Order, takes her bedtime

medicine, and goes to bed. (*Id.*)

At times Plaintiff has trouble sleeping because her mind runs in circles and she gets throat spasms similar to burping. (R. 79–80.) The doctors do not know what causes the throat spasms. (R. 80.) While doctors believe it might be Tourette's they have not diagnosed her disorder. (*Id.*)

Plaintiff does 20 minutes of physical therapy for her back every day. (R. 69.) She also tries to walk about a mile every day. (*Id.*) She is trying to quit smoking and does not drink. (R. 70.) Since March 2012 she tried marijuana for her nausea and vomiting, but does not use it anymore. (*Id.*)

Plaintiff has good and bad mental health days. (R. 74.) She only has one or two good days a week, however. (*Id.*) When Plaintiff is away from home for approximately two hours she is so anxious to return that she cannot think about anything else but getting back home. (R. 71.) She once had an episode where she had a full grocery cart and just left it in the store because she all of a sudden wanted to be home and had to leave immediately. (R. 71–72.) Plaintiff also has alopecia, which makes her self conscious and heightens her anxiety. (R. 79.)

Plaintiff gets panic attacks at least a couple times per month. (R. 72.)

The attacks last two or three minutes but then it takes her about 45 minutes to recover. (R. 73.) She takes Effexor for her anxiety and panic attacks, which "is pretty much holding on." (*Id.*) Being away from home and being around people from whom she gets the wrong kind of "vibe" triggers her panic attacks. (R. 72.) Males are more likely to trigger her panic attacks than females. (*Id.*) Plaintiff was sexually assaulted by a co-worker/mentor twice, once when she was 17 and again in 2004 when he raped her. (R. 72–73.)

Plaintiff gets migraines three to five times a month that last for a couple of hours. (R. 74.) Plaintiff also has lower right back pain, which manifests as a constant dull ache. (R. 76.) She can sit for an hour and a half at a time until her back pain starts radiating to her hip. (R. 76–77.) She got SI joint injections in the past for her hip. (R. 77.) She also has pain due to an old muscle tear. (R. 68.) Doctors told her the tear will never heal and surgery will not help. There is nothing she can do for her shoulder pain except take pain medicine. (*Id.*)

A doctor recommended surgery in January 2011, but Plaintiff did not have the surgery because, at the time, she was the only person capable of driving her father to his chemotherapy treatment. (R. 78.) She followed up

with the doctor after her father was done with his treatment, but the doctor was too concerned with Plaintiff's noncompliance regarding appointments to want to go forward with anything at that point. (*Id.*) Plaintiff was noncompliant with the appointments, however, because she was helping her father with his chemotherapy. (*Id.*)

Plaintiff currently takes Effexor, Abilify, gabapentin, meloxicam, gazanadine,[4] almetrozol,[5] Miralax, and Wellbutrin, which her mother has to remind her to take each day. (R. 74–75.) The Effexor and Abilify were increased since 2012, and the Miralax decreased. Her medications cause drowsiness, fogginess, and fatigue. (*Id.*) The increase in medication dosages have also increased her symptoms. (R. 76.) Her fatigue makes her feel like she does not have any motivation to do anything. (*Id.*) That makes it hard to have a consistent schedule. (*Id.*)

Plaintiff previously worked at Burger King making sandwiches. (R. 64.) She had to stop, however, because it got to be fast-paced and too much. (*Id.*) She ended up having a panic attack and could not stand to go back so she quit. (R. 65.) She thereafter worked as an assistant machine

---

[4] This medication was transcribed phonetically.

[5] This medication was transcribed phonetically.

operator making plastic bags. She was fired from that job, however, because she had a migraine one day and was missing too many days from headaches and other problems. (*Id.*) She moved on to another machine operator job making envelopes, but was laid off because she missed too many days due to constipation problems, migraines, and anxiety. (R. 65–66.)

None of Plaintiff's doctors have told her that she is unable to work. (R. 66.) Her psychiatrist told her, however, that she should not try to work around the general public. (R. 66–67.)

Her condition has worsened since March 2012 when the prior ALJ's decision denied her application for benefits. (R. 63.) Her burping has gotten worse and her treatment for constipation has led to the opposite problem. Her migraines also have not gotten much better. (*Id.*)

## C.   The ALJ's Findings

As an initial matter, the ALJ found that the time period from October 10, 2008, through March 1, 2012, was previously adjudicated and was, therefore, res judicata. (R. 38.) Accordingly, the ALJ declined to address Plaintiff's allegations and the records from that time period in her decision. (*Id.*)

The ALJ then determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. (R. 40.) She further determined that Plaintiff had not engaged in substantial gainful activity since October 10, 2008. (*Id.*) The ALJ found that Plaintiff has the following severe impairments: (1) Major joint dysfunction; (2) Disorders of the spine; (3) Affective disorders; and (4) Anxiety related disorders. (*Id.*) At step three, the ALJ did not find that any of the impairments or combination of impairments met or medically equaled the severity of one of the listed impairments. (R. 41.)

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible for the reasons discussed in the ALJ's decision. (R. 47.) Thus, the ALJ concluded at step four that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations: no more than occasional climbing of ramps and stairs, balancing, or climbing of ladders, ropes, and scaffolds, no more than simple, routine, and repetitive tasks, and no more than

occasional interaction with supervisors, co-workers, and the general public.
(R. 43.) The ALJ further determined that Plaintiff is unable to perform past
relevant work. (R. 49.)

At step five, however, based on Plaintiff's age, education, work
experience, and RFC, the ALJ found there are jobs that exist in significant
numbers in the national economy Plaintiff can perform, including office
helper, assembler, and housekeeper. (R. 50.) Accordingly, the ALJ
determined Plaintiff has not been under a disability from the date of the
previous hearing level decision through the date of the ALJ's decision. (R.
51.)

## IV.  DISCUSSION

On appeal, Plaintiff's sole argument is that the ALJ erred in
assessing Plaintiff's credibility pertaining to her anxiety and agoraphobia.
(ECF No. 17.)

A claimant may establish her disability through her own testimony of
pain or other subjective symptoms. *Dyer v. Barnhart*, 395 F.3d 1206, 1210
(11th Cir. 2005); *Foote*, 67 F.3d at 1560–61. The ALJ must consider a
claimant's testimony of pain and other subjective symptoms where the

claimant meets the Eleventh Circuit's three-part "pain standard." *Foote*, 67 F.3d at 1560. Under that test, evidence of an underlying medical condition must exist. *Id.* If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying medical condition, or evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms. *Id.* A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability. *Id.* at 1561.

If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce her symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work. 20 C.F.R. §§ 404.1529(c)(1); 416.929(c)(1). In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and her doctors. §§ 404.1529(c)(1)–(2), 416.929(c)(1)–(2). The ALJ may consider other factors, such as: (1) the

claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of the claimant's medication; (5) any treatment other than medication; (6) any measures the claimant used to relieve her pain or symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to her pain or symptoms. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ then examines the claimant's statements regarding her symptoms in relation to all other evidence, and consider whether there are any inconsistencies or conflicts between those statements and the record. §§ 404.1529(c)(4), 416.929(c)(4).

If the ALJ decides to discredit the claimant's testimony as to her subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding. *Foote*, 67 F.3d at 1561–62. While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was not credible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.* at

1562.

The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991). The Court will not disturb a properly articulated credibility finding that is supported by substantial evidence. *Foote*, 67 F.3d at 1562. The failure to articulate reasons for discrediting a claimant's subjective testimony, however, requires that the testimony be accepted as true and becomes grounds for remand where credibility is critical to the outcome of the case*. Id.*

In this case the ALJ determined that Plaintiff has medically-determinable impairments that could reasonably be expected to produce her symptoms. After evaluating the intensity and persistence of Plaintiff's symptoms in determining how they limit her capacity for work, however, the ALJ concluded that Plaintiff's statements were not entirely credible. (R. 47.) Substantial evidence supports the ALJ's credibility determination.

For starters, the ALJ discussed Plaintiff's activities of daily living, which suggest her symptoms are not as limiting as alleged. *See* §§ 404.1529(c)(3), 416.929(c)(3) (a claimant's daily activities are relevant in

evaluating her symptoms). For example, the ALJ noted that in July 2012

Plaintiff reported being capable of a wide range of activities of daily living.

Despite not doing much grocery shopping, Plaintiff was able to drive and

ran errands for her parents. (R. 527.) Notably, she drove herself

approximately thirteen miles to her appointment with Dr. Johnson,

unaccompanied. (R. 525.) Plaintiff cleaned, prepared simple meals,

watched television, spent time on the computer, and read. (R. 527.) She

did not need reminders to take her medications. (*Id.*) Despite having limited

socialization, Plaintiff denied having difficulty getting along with the general

public or authority figures. (*Id.*) To that extent, two months prior, Plaintiff

even discussed possibly volunteering. (R. 515.) Similarly, Plaintiff admitted

at the hearing that she is on Facebook, uses email, and goes to her

friend's house twice a month. Despite complaints of debilitating anxiety,

panic attacks, agoraphobia, and depression, these activities suggest

Plaintiff's impairments may not be as limiting as alleged.

The ALJ also found that the objective medical evidence does not

support Plaintiff's assertion that her anxiety and panic attacks interfere with

her ability to maintain a work schedule. (R. 48.) Indeed, during

examinations Plaintiff was consistently cooperative and engaged. She consistently demonstrated good eye contact, largely normal speech, and coherent thinking. The ALJ also appropriately noted that there are no references in the medical record that Plaintiff has had any problems attending medical appointments or interacting with medical staff. (*Id.*)

Moreover, there is an unexplained gap in treatment between October 2013 and April 2014, which suggests that the severity of Plaintiff's symptoms had decreased during this period. *See Harden v. Colvin*, No. 8:15-cv-755-T-30JBT, 2016 WL 551794, at *7 (M.D. Fla. Jan. 26, 2016) (ALJ properly considered the unexplained lengthy gaps in plaintiff's treatment in discounting plaintiff's credibility).[6]

Plaintiff argues that it "go[es] without saying that someone [who] has been raped twice could credibly, while appearing to be okay, in fact be[] significantly traumatized and exhibit the signs and symptoms of rape trauma syndrome and complex post-traumatic stress disorder." (ECF No. 17 at 33.)  While there is no medical evidence in the record supporting Plaintiff's conclusional statement, the focus for RFC purposes, is on the

---

[6] Plaintiff does not argue that the ALJ should have inquired about that gap in treatment.

functional limitations an impairment imposes, rather than on the diagnosis itself. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) (the proper focus in determining a claimant's RFC, however, is the claimant's functional limitations, not the diagnosis). And despite Plaintiff's argument, none of Plaintiff's medical records even suggest that she has ever been diagnosed with either rape trauma syndrome or complex post-traumatic stress disorder.[7]

The objective medical evidence further demonstrates Plaintiff's impairments have improved with medication, lifestyle changes, and therapy. *See* §§ 404.1529(c)(3), 416.929(c)(3) (the type, dosage, effectiveness, and side effects of a claimants medications and treatment other than medications are relevant in assessing a claimant's symptoms). In April 2012, Plaintiff's response to medication and other concurrent treatment was good. (R. 520.) Plaintiff repeatedly reported having a good response to psychotherapy. In May 2012, Plaintiff had not had any panic attacks since her last session several weeks beforehand. (R. 514.) At her

---

[7] To the extent Plaintiff claims the ALJ erroneously viewed Plaintiff's post-traumatic behaviors as detracting from her credibility, Plaintiff provides no further argument supporting this assertion. Instead, for the reasons discussed herein, substantial evidence supports the ALJ's credibility determination.

next session, Plaintiff reported that her mental symptom severity was improved. (R. 512.) In April 2014 Plaintiff stated that her coping ability was one of her strengths. (R. 704.)

The ALJ also properly considered various inconsistencies that detracted from Plaintiff's credibility. *See Ybarra v. Comm'r of Soc. Sec.*, 658 F. App'x 538, 540–41 (11th Cir. 2016) (substantial evidence supported ALJ's finding that plaintiff was not fully credible where plaintiff's testimony was inconsistent with the medical records in several places). For example, despite Plaintiff's testimony regarding sleep problems, she repeatedly told medical professionals that she was getting restful sleep and that she did not have insomnia. (R. 47, 506, 508, 512, 514, 518, 651, 704.)  And, despite Plaintiff's testimony that her medications cause significant side effects, such as fatigue and drowsiness, her medical records consistently note that she had no complaints with her medications and that she had a normal energy level. (R. 48, 506, 508, 512, 514, 518.)

Finally, the ALJ considered other evidence in evaluating Plaintiff's credibility, including Plaintiff's failure to adhere to her narcotics contract and Plaintiff's pattern of filing DIB and SSI benefit applications twice in the

recent past, which were denied. (R. 48); *see* §§ 404.1529(c)(1),

416.929(c)(1) (ALJ must consider all of the available evidence in evaluating

the intensity and persistence of a claimant's symptoms). The ALJ properly

concluded that these factors detracted from Plaintiff's credibility as a

whole. *See Davis v. Colvin*, No. 1:16cv30-MP/CAS, 2016 WL 7177545, at

*12 (N.D. Fla. Aug. 30, 2016) (ALJ properly considered Plaintiff's

contradictory statements regarding illicit drug use in assessing plaintiff's

credibility), *adopted*, 2016 WL 7175618 (N.D. Fla. Dec. 8, 2016); *Morales-

Parris v. Colvin*, No. 1:12-CV-1691-RDP, 2014 WL 2003115, at *7 (N.D.

Ala. May 15, 2014) (ALJ's consideration of evidence pertaining to Plaintiff's

prior claim was consistent with the requirements of the social security

regulations).

In sum, the ALJ articulated explicit and adequate reasons based

upon the evidence in the record for rejecting Plaintiff's testimony pertaining

to her symptoms. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.

1991) ("[T]he ALJ's discretionary power to determine the credibility of

testimony is limited by his obligation to place on the record explicit and

adequate reasons for rejecting that testimony."). The ALJ has wide latitude

in evaluating the weight of evidence, particularly the credibility of witnesses. *Owens v. Heckler*, 748 F.2d 1511, 1514 (11th Cir. 1984). An ALJ's factual determinations are entitled to deference. *Landry v. Heckler*, 782 F.2d 1551, 1554 (11th Cir. 1986).  Where, as here, substantial evidence supports the ALJ's credibility determination, the Court cannot overturn the ALJ's findings. Accordingly, the Commissioner's decision should be affirmed.

## V.  RECOMMENDATION

In light of the foregoing it is **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**DONE AND ORDERED** this 20th day of June 2017.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**